# CHARLESTON.

SUPERIOR ELKHORN BY-PRODUCTS COAL COMPANY *v.* THREE STATES COAL COMPANY

(No. 6166)

Submitted October 23, 1928. Decided October 30, 1928.

*Hugh G. Woods* and *H. L. Ducker,* for plaintiff in error.
*Sanders, Crockett, Fox & Sanders,* for defendant in error.

LIVELY, PRESIDENT:

Superior Elkhorn By-Products Coal Company, plaintiff below and plaintiff in error, (hereinafter called the Elkhorn for brevity), sued Three States Coal Company (hereinafter called Three States for brevity), on a contract for sale of coal

amounting to $2,040.16. The Three States admitted the correctness of the amount sued on as the price of the coal it had received and had not paid for, but claimed by way of recoupment damages for breach of contract amounting to approximately $11,000.00. Having admitted the correctness of plaintiff's account, the only question at issue was whether Elkhorn had breached the coal contract to the damage of Three States and to what extent, and 'the suit resolved itself into that controversy, the Three States opening the case with its evidence on the alleged breach. At the conclusion of all the evidence the court instructed the jury to return a verdict in favor of Three States for $1,300.00, which was accordingly done; and the court having overruled a motion to set aside the verdict and grant a new trial, entered judgment on the verdict, from which Elkhorn prosecutes this writ.

The controlling question is whether the evidence is so clear and convincing in favor of a verdict of $1,300.00, that the court was warranted in taking the case from the jury; in other words, whether the evidence presented questions for the jury or for the court.

Elkhorn produced coal from a small mine in Kentucky, and Three States is a coal selling agency with offices in Bluefield, W. Va. On June 11, 1926, Three States wrote a letter to Elkhorn asking if it would be interested in an order for forty thousand tons at $1.30 net ton mines shipment to be made from date until November 15th, in approximately equal monthly installments with the exception of July and August, during which months ten or eleven thousand tons would be required. Or if the entire tonnage was not acceptable then a smaller tonnage for shipment over the period; the order to be considered "in the nature of a backlog." The shipment was to be western shipment. On the same date Elkhorn wired Three States: "Will accept order one car daily to November 15th, Elkhorn steam mine run." Three States immediately wired: "Accept offer one car daily mailing order." The mailed order of Three States was dated on the same date and was for one car daily until November 15th, shipment to begin immediately and in hopper bottom cars, mine price $1.30 per net ton f. o. b. mines, to be consigned to Three States Coal

Company at "Russell (Ky.) Scales." It does not appear when the order through the mails was received. On June 21, following, Elkhorn wrote Three States acknowledging the order and advising that they were starting shipments that day, and noting that the order called for *hopper bottom* equipment, and asking if that was absolutely necessary, advising that it was impossible to secure such equipment at all times, as was the case that day, and for that reason that the car then shipped was a drop gondola. That letter was replied to on June 22nd, in which Three States advised the Elkhorn that they were writing customer asking if shipments could be in other than hopper cars and if a favorable reply was received it would communicate that reply to the Elkhorn. No further advice as to the character of car in which the shipments could be made was received by Elkhorn. A car was shipped on the 22nd, another on the 24th, another on the 26th, and another on the 30th, according to the evidence of Three States. Lindsey, secretary-treasurer of Elkhorn, says that the reason why shipments did not begin on the 14th and follow daily was that his company was not able to get hopper bottom equipment all the time and that the order called for hopper bottom equipment. Three States in its account for damages for breach includes the days of no shipment between the 21st of June and July 3rd, a difference between contract price of $1.30 per ton and the price it claims it would have received on the market had the coal been delivered on those days. The answer to that claim is, as above indicated, that Elkhorn could not ship because of want of hopper bottom equipment for which the order called, and it had not then and never had been advised as to whether other equipment would be acceptable. As to this part of Three States' item of damage under the recoupment a simple statement is sufficient to impel the conclusion that it was a jury question whether Three States could recover for the coal not shipped consecutively on these dates. It was for the jury to say whether Three States had relieved Elkhorn from hopper bottom equipment or whether Elkhorn could, in fact, have procured such equipment, in conformity with the order. Mr. Lindsey further says that after June 21st, he loaded coal daily and reg-

ularly and consecutively "one day with another", with the possible few exceptions of some days when they did not have cars and the mines were drowned out a few days, until October 8th, when he wired Three States that no more coal would be shipped for their account. The reason for no further shipment was that Three States had not paid for the coal that had already been shipped and suspension of shipment would be made until the money due was paid. This is another point in controversy under the evidence, and will be dealt with later. On July 3rd, Three States directed shipments to be made for the east thus diverting the shipment from western shipment to tidewater. Elkhorn began the tidewater shipment in accordance with this direction, but soon thereafter embargoes were placed upon eastern shipments by the railroad company and about the 22nd of July Elkhorn so advised Three States. The latter recognizing the situation, undertook to advise by wire the days on which the embargoes were lifted. There is considerable controversy as to the days on which the embargoes were lifted until the time Elkhorn refused to make further shipments. Lindsey says that the telegrams from Three States advising with reference to lifting of the embargoes often had to be delivered over a local telephone company which was often out of order and when he would receive notice of lifting of the embargoes in that way, it was too late for shipments. The substance of his evidence is that they endeavored to comply with the terms of the contract, were ready, able and willing to send a car of this class of coal each day consecutively when there was no embargo, with the exception of approximately ten days in August when the part of the mine from which this coal is taken was flooded. It is contended by Three States that the flooding of the mine was no excuse, because it is not shown by the evidence that the flooding was unavoidable, and hence was not an act of God, and was not proper to go to the jury. Lindsey says that the flooding was caused by an extraordinary rain. While the evidence of the flooding and its cause it not as strong as it might be, we think a jury question there arose as to whether Elkhorn was at fault, and the court could not arbitrarily disregard it.

We next come to the controversy as to the cause of the suspension of shipment by Elkhorn in the early part of October. The reason for that, as given by Lindsey, is that the payment for coal shipped in August was not made by Three States on or before September 25th. It seemed to be a custom as to payments, where none is provided for in contracts of this character, that the coal shipped the preceding month and for which the vendee received weights was to be paid for between the 15th and 25th of the following month. Three States had been paying on the 25th of the month for the coal shipped the preceding month for which it had received weights. As to this controversy, Mr. Clayborne for the Three States says that he closed his books on the 8th of September, and at that time had not received weights for the coal shipped prior thereto. He says that he received weights on the 13th of September, and that the coal for which plaintiff demanded payment immediately was not to be paid for until October 25th, and therefore the sum of money demanded by Elkhorn was not due, and they had no right to suspend shipment for that reason. The reason that he gives for the assertion that these weights were received on the 13th of September is because of the stamp thereon, indicating that they were received on that date, whereas, there is evidence in support of the contention of Elkhorn that these weights were made out on the 31st day of August, and should have been received by Three States in the early days of September. The evidence is not detailed, but is simply stated to indicate that there was a substantial controversy on this point and therefore a jury question.

It is asserted by counsel for Three States that the evidence of embargoes has no place in the trial, and should have been excluded on its motion for the reason that the contract said nothing about impediments of that character such as strikes, embargoes and the like. We do not think this argument tenable. The contract brought about by these telegrams, orders and correspondence related to western shipments. On July 3rd, Three States modified it so as to make the shipments to tidewater where better prices could be obtained on account of the strike of English coal miners. It could be reasonably

contemplated that other coals would be rushed to tidewater (a condition which was in actual formation), and embargoes would necessarily follow. The actual fact was communicated by Elkhorn to Three States, and the latter undertook to avoid as far as possible that situation by advising when the embargoes would be lifted and insisting that shipment should be speedily made. The circumstances under which the change was made from western to eastern shipment would almost indubitably point to embargoes. And under the facts here developed, we think the evidence was proper to be considered by the jury and the sharp conflict with relation thereto decided by it. Enough has been said to point out that there is serious controversy upon the controlling issues in the case. It is contended by counsel for Three States that the evidence to sustain its side of the controversy on the main issues is so overwhelming that it was proper for the court to take the consideration thereof from the jury and arrive at the amount of damage to which Three States was entitled. Granting that the evidence preponderates in favor of the contention of Three States, (but not saying by this remark that it does), we cannot hold that there is such a decided and vast preponderance that the case should have been taken from the jury. It would serve no useful purpose to analyze the verbal and written evidence and determine what weight should be given to the evidence of either of the parties, for the weight of evidence is peculiarly within the province of jury determination. The general rule in such cases, well established, is that a court should not take from a jury a case unless it would be compelled to set aside the verdict if that verdict should be in favor of one party or the other. The principle is well stated in *Bank* v. *Lowry,* 79 W. Va. 10, point 4 of the syllabus, as follows: "The court should never direct a verdict for one party except in a case where if the jury should return a verdict for the other party, the court would be compelled to set such verdict aside." That principle controls this case as it is now presented. It would be useless to encumber this opinion with numerous citations of cases and text books which accentuate this well settled principle governing jury trial.

Concluding that the questions of fact should have been left to the decision of the jury under proper instructions of the law governing, the verdict and judgment will be set aside, a new trial awarded, and the case remanded.

*Reversed and remanded.*